1
2
3
4          IN THE UNITED STATES DISTRICT COURT
5          FOR THE NORTHERN DISTRICT OF CALIFORNIA
6
7    SALVADOR M. RENTERIA,
8              Petitioner,                    No. C 08-5325 CRB
9         v.                                  **ORDER DENYING PETITION FOR A
                                              WRIT OF HABEAS CORPUS**
10   DERRAL G. ADAMS,
11             Respondent.
                                        /
12
13                          **<u>INTRODUCTION</u>**

14         Petitioner Salvador M. Renteria, a state prisoner at the California State Prison, Corcoran,

15   seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging his conviction of second

16   degree murder and attempted second degree murder, each with an enhancement for discharging a

17   firearm, for which was sentenced to a determinate term of seven years, followed by an

18   indeterminate term of 65 years to life.

19         Petitioner challenges his convictions on the grounds that the trial court exposed him to

20   double jeopardy when it declared a mistrial, and when he conducted his subsequent bench trial,

21   and that his waiver of a jury trial was not knowing, voluntary and intelligent. For the reasons

22   stated below, the petition for a writ of habeas corpus is DENIED.

23                          **<u>PROCEDURAL BACKGROUND</u>**

24         On October 10, 2002, the Santa Clara County District Attorney filed an information

25   charging Petitioner with murder (Cal. Penal Code § 187) and premeditated attempted murder

26   (Cal. Penal Code §§ 187, 189, 664). The information further alleged with respect to both counts

27   that Petitioner had discharged a firearm inflicting great bodily injury (Cal Penal Code §§

28   12022.53(b)-(d), 12022.5(a), 12022.7).

1    On July 11, 2003, the trial court declared a mistrial after the jury announced that it was

2    unable to reach a verdict on the lesser included offenses of second degree murder, voluntary

3    manslaughter, and involuntary manslaughter.

4    On May 10, 2005, Petitioner waived his right to a jury on retrial and agreed to retry the

5    case as a bench trial.

6    On August 17, 2005, the trial court found Petitioner guilty of second degree murder and

7    attempted second degree murder, and found true the enhancements. The court sentenced

8    Petitioner to a determinate term of seven years, followed by an indeterminate term of 65 years to

9    life.

10    On August 28, 2007, the California Court of Appeal affirmed the judgment.

11    On October 3, 2007, Petitioner filed a petition to review in the California Supreme Court.

12    The court denied review on November 28, 2007.

13    On November 25, 2008, Petitioner filed the instant petition for a writ of habeas corpus

14    under 28 U.S.C. § 2254. At that time, however, Petitioner had not yet exhausted his state

15    remedies with respect to some of his claims and moved this Court to stay the petition while the

16    claims were presented to the California Supreme Court. On April 16, 2009, this Court issued an

17    amended order granting the stay request.

18    On April 29, 2009, pursuant to this Court's order, Petitioner filed his state habeas petition

19    in the California Supreme Court. The court denied his petition on October 14, 2009.

20    On November 10, 2009, this Court issued an order lifting the stay on Petitioner's habeas

21    case.

22    **FACTUAL BACKGROUND**

23    The California Court of Appeal summarized the facts as follows:

24    Prior hostilities between Salvador Morales "Chava" Rentería, the [Petitioner] in
      this case, and his enemies Herman Cuevas and Abelardo Chávez, Cuevas's
25    cousin, led [Petitioner] to shoot Chávez to death and shoot and wound Cuevas.
      [Petitioner] committed the crimes on May 22, 2001.

26

27

28                                          2

Four days before, on May 18, 2001, [Petitioner], Chávez, and Cuevas were at a gathering at a third party's house. [Petitioner] got into an argument with Guadalupe "Lupillo" Ramos, displayed a gun, and threatened to shoot Chávez, Cuevas, and Ramos. [Petitioner] then left in his black General Motors Corporation pickup truck. At the gathering Cuevas learned that it was [Petitioner] who had hit him with a bottle a year before. Cuevas and others, including Chávez, located [Petitioner] at a local bar, the Desperado Club, to confront him. Cuevas started a fist fight with [Petitioner], who came out the loser.

On May 22, 2001, Cuevas and Chávez had just arrived at a bar called Maria's Club. They had just seated themselves at adjoining bar stools when [Petitioner] drove his pickup truck into the parking lot and Chávez, recognizing it, alerted Cuevas. Cuevas told the bartender, Florencia "Jessica" Aramburo, not to let the truck's occupants into the premises. Aramburo found [Petitioner] standing silently at the bar's front door. She had seen him carrying a pistol at the bar two months before and, remembering the episode, told him not to cause trouble. [Petitioner] was with Miguel "Baby" Vargas, who was related to one of the bar's employees. [Petitioner] told Aramburo not to interfere and that he had a dispute with others-he then pointed to Chávez-that they would settle as men. Chávez, accompanied by Cuevas, came to the front door. Chávez said he was unarmed, knew that [Petitioner] was armed, and did not want any problems. [Petitioner] acknowledged that he was armed and (possibly at Chávez's invitation) displayed his handgun. He appeared angry and nervous and his movements were jerky. Chávez and Cuevas, who was also unarmed, went back into the bar and had begun sitting down again when [Petitioner] drew his gun and, firing past Aramburo, who witnessed the shooting from four or five steps away, shot both of them. [Petitioner] fired a total of five shots from a .45-caliber semiautomatic pistol. One round hit Chávez, another hit Cuevas, and two others lodged inside the establishment's open front door. A shell casing found outside marked the firing of the fifth round.[1]

Chávez, who lay dead on the floor of Maria's Club, had been fatally shot in the back. The bullet that killed Chávez had passed through his spine and aorta and a lung, and had fractured two bones.

Cuevas survived his wounds. In the opinion of San Jose Police Sergeant Bruce Marten Wiley, a qualified expert in wound ballistics, Cuevas suffered penetrating wounds to both thighs and the bullet that caused them may have glanced off of one thighbone. Cuevas was treated at a hospital and released. He retained scars from his wounds but immediately after being shot was able to run behind the bar, call 9-1-1, and kneel beside Chávez in an effort to ascertain the extent of his injuries and possibly render aid after the shooting. He was not permanently disabled.

[Petitioner] testified on his own behalf and produced corroborating witnesses. Cuevas's associate Ramos was a dangerous drug dealer who had pistol-whipped [Petitioner] at the Desperado Club four days before [Petitioner] killed Chávez and

---

[1]The witnesses' accounts of the rapid sequence of events in the minutes before the shootings vary in minor, unessential details. Our summary emphasizes the testimony that, in our view, contains the best recollections.

3

1   wounded Cuevas. Cuevas was present during the pistol-whipping incident and
    had beaten and threatened [Petitioner]. Chávez was also present. Both Cuevas and
2   Ramos were armed at the time and someone had put a gun to [Petitioner]'s head.
    [Petitioner] was bleeding copiously after the beating. After that incident,
3   [Petitioner] started carrying a gun.

4   Ramos had a friend who had, in Ramos's presence, threatened to shoot
    [Petitioner] in November of 2000. [Petitioner] pushed the gun away from his knee
5   and it discharged.

6   [Petitioner] denied ever hitting Cuevas with a bottle.

7   At Maria's Club on the day of the shootings, [Petitioner] met Aramburo at the
    front door, who warned him not to enter because his enemies were inside.
8   [Petitioner], who had not gone to Maria's Club looking for trouble, surmised that
    Cuevas, Chávez, and Ramos were in the bar. Chávez came to the door, repeated
9   threats he had made earlier, and said that if [Petitioner] was carrying a gun he
    should produce it. [Petitioner] was afraid, and when he saw Chávez pull up his
10  shirt rapidly in the gloom of the bar's interior, thought that he saw a gun in
    Chávez's hand. [Petitioner] did not see Cuevas inside the bar.
11
    [Petitioner] fired his gun. His first two shots struck the bar's door. The next two
12  struck Chávez and Cuevas. At the time, [Petitioner] feared for his life and
    intentionally shot Chávez in self-defense. [Petitioner] ran from the bar, firing a
13  fifth shot into the air to ward off any pursuers.

14  People v. Renteria, No. H029729, 2007 WL 2421774, at **1-2 (Cal. Ct. App. Aug. 28,
    2007).
15
16                            **JURISDICTION AND VENUE**

17      This Court has subject matter jurisdiction over this habeas action under 28 U.S.C. § 2254

18  and 28 U.S.C. § 1331.  Venue is proper because the challenged conviction occurred in Santa

19  Clara County, California, which is within this judicial district.  28 U.S.C. § 2241(d).

                                    **EXHAUSTION**
20
21      State prisoners who wish to make a collateral challenge using habeas proceedings to

22  either the fact or length of their confinement must first exhaust all state judicial remedies. 28

23  U.S.C. § 2254(b), (c).  Petitioner satisfied the exhaustion requirement when his petition for

24  review to the California Supreme Court was dismissed on October 14, 2009.

                                **PETITIONER'S CLAIMS**
25
26      Petitioner claims that his federal constitutional rights were violated because (1) the trial

27  court  declared a mistrial without legal necessity, (2) the trial court retried Petitioner for first

28                                          4

1    degree murder after a jury had already acquitted him of first degree murder, and (3) Petitioner's

2    waiver of a retrial by jury was not made knowingly, voluntarily, and intelligently.

3    **STANDARD OF REVIEW**

4         This court may entertain a petition for a writ of habeas corpus in behalf of a person in

5    custody pursuant to the judgment of a state court "on the ground that he is in custody in violation

6    of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). But under the

7    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petition may not

8    be granted with respect to any claim adjudicated on the merits in state court proceedings unless

9    the state court's adjudication "resulted in a decision that was contrary to, or involved an

10   unreasonable application of, clearly established federal law, as determined by the Supreme

11   Court," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in

12   light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

13        A state court decision is contrary to clearly established federal law if it "applies a rule

14   that contradicts the governing law set forth" by the Supreme Court or if it "confronts a set of

15   facts . . . materially indistinguishable from a decision of [the Court] and nevertheless arrives at a

16   result different from [that] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

17   Otherwise, habeas relief may be granted if the reviewing court determines that the state court

18   decision constitutes an "unreasonable application of clearly established federal law, or [is] based

19   on an unreasonable determination of the facts." Early v. Packer, 537 U.S. 3, 11 (2002) (emphasis

20   in original) (internal quotation marks omitted). This standard of review is highly deferential to

21   the state courts and demands that the state-court decisions "be given the benefit of the doubt."

22   Woodford v. Visciotti, 537 U.S. 19, 24 (2002); Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997).

23        Put simply, "a federal habeas court may not issue the writ simply because the court

24   concludes in its independent judgment that the relevant state-court decision applied clearly

25   established federal law erroneously or incorrectly. Rather, that application must also be

26   unreasonable." Williams, 529 U.S. at 411. A federal habeas court making the "unreasonable

27

28   5

1  application" inquiry should ask whether the state court's application of clearly established
2  federal law was "objectively unreasonable." Id. at 409.
3      For purposes of federal collateral review, the reviewing court must look beyond the
4  summary denial to the last reasoned decision as the basis for the state court's judgment.
5  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing Ylst v. Nunnemaker,
6  501 U.S. 797, 803-04 (1991)).  In this case, we review the decision of the California Court of
7  Appeal affirming the judgment of the trial court because the California Supreme Court ultimately
8  denied review of the Petitioner's appeals without comment or discussion.

9                                    **DISCUSSION**

10  **I.   THE TRIAL COURT'S DECLARATION OF A MISTRIAL**

11      Petitioner first claims that the trial court's declaration of a mistrial was without legal
12  necessity and, consequently, his second trial violated the prohibition against double jeopardy.
13  Pet. at 5; U.S. Const. amend. V. The claim is without merit because it was not objectively
14  unreasonable for the Court of Appeal to conclude that the jurors' impasse created the requisite
15  legal necessity to declare a mistrial.

16  **A.   Background**

17      The California Court of Appeal summarized the facts giving rise to this claim as follows:

18      Instructing the jury in the language of CALJIC No. 8.75, the trial court stated: "If
        you find the [Petitioner] not guilty of murder in the first degree as to Count 1 but
19      cannot reach a unanimous agreement as to murder in the second degree, your
        foreperson should sign and date the not guilty of murder in the first degree form
20      and should report your disagreement to the Court. And do not sign any other
        verdict forms."
21
22      The trial court then added its own gloss on the instructions after reading the
        standard instructions to the jury:

23      The trial court suggested that the standard instructions and the verdict forms could
        bewilder the jury: "Now, on the instructions about lesser included offenses, the
24      verdict forms are I know very confusing. However, by law I must read those to
        you." It then proceeded to interpret CALJIC No. 8.75 for the jury as follows:
25
26      "In the event of another event that can occur [a partial acquittal and a partial
        deadlock], I read it [CALJIC No. 8.75] to you but it's confusing how it goes. If
27      you're unable to reach a unanimous verdict, let's take the first one, first degree

28                                          6

murder, do not go to anything else, *do not fill out anything else*. And you've seen commonly on TV, a hung jury. Tell the deputy that and stand by for further instructions. You'll be instructed about that. And that will be true, for instance, if you found him not guilty of first degree murder and say now you're on second degree murder, that you are now a hung jury, you cannot decide unanimously where all 12 agree. Advise the deputy, *don't fill anything out*, you're unable to reach a unanimous verdict, stand by for further instructions." (Italics added.)

On the fourth day of deliberations the jury returned to the courtroom for further instruction without having completed any verdict forms. Certain jurors informed the court that they all had agreed [Petitioner] was not guilty of first degree murder, but were otherwise deadlocked. Those jurors explained that in the course of what the court characterized as "extensive deliberations," they were divided as follows: six to convict [Petitioner] of second degree murder, three to convict him of manslaughter (the jurors had not decided what type of manslaughter), two to acquit him of all charges on grounds of justifiable self-defense, and one who remained undecided between lawful self-defense and manslaughter. As for the first degree murder charge, jurors offered conflicting accounts about whether the jury had reached a decision, as we will explain in detail below.

The trial court asked the jury foreperson if further deliberations would likely result in a unanimous verdict on the charges on which the jury was deadlocked, and the foreperson responded: "In my opinion, no." The court then asked the jurors if anyone thought "further deliberations would have a likelihood of a unanimous decision." The jurors all remained silent. Evidently at that point the court and the jurors had in mind only the charges on which the jury was undisputedly deadlocked.

As for the first degree murder charge, although certain jurors told the court that the jury had found [Petitioner] not guilty, the trial court refused to enter a judgment of acquittal on that charge after learning that the jury had not acquitted [Petitioner] with sufficient formality[.]

    [¶] . . . [¶]

The trial court expressed concern that the jury had not reduced to writing its decision, if it had reached one, on first degree murder. "That would be clear you didn't follow the instructions," the court commented to the jurors. "The instructions are first you go to first degree murder, guilty or not guilty. If it's not guilty then go lower. Not vote all at the same time. You can't go to a lower one until you find him not guilty unanimously of a higher one, then go to the lower one. L.I.O., lesser included offense. But anyway, it's your opinion-there will be a lot of hearings about this, I can assure you."

The trial court implicitly found that legal necessity required declaring a mistrial, and it discharged the jury. It noted for the record: "The ... Court is aware that the jury has been in extensive deliberations, has considered extensive readback of, in the Court's opinion, the major witnesses to the case, and further, have voted and are unable to reach a unanimous verdict and the inquiry to the jury is no members of the jury find that further deliberations would likely lead to a unanimous verdict of the entire jury. The Court at this time agrees and concurs with that. Madam Clerk, I'm going to declare a mistrial in this matter. The case is mistried."

7

1   <u>Renteria</u>, 2007 WL 2421774, at **3-6.

2          Petitioner was subsequently retried by the court based on the record compiled at the first

3   trial and a new round of closing arguments.

4   **B.      Court of Appeal's Opinion**

5          The Court of Appeal reviewed the trial court's decision for abuse of discretion. <u>See</u>

6   <u>People v. Cook</u>, 39 Cal.4th 566, 615 (2006). It found that the trial court did not abuse its

7   discretion in declaring a mistrial because it was made implicitly on the grounds of "legal

8   necessity," which exists if "it satisfactorily appears to the court that there is no reasonable

9   probability that the jury can resolve its differences and render a verdict." <u>People v. Rojas</u>, 15

10  Cal.3d 540, 545-46 (1975) (per curiam).

11         In finding that the trial court did not abuse its discretion, the Court of Appeal reasoned

12  as follows:

13         With regard to the lesser included offenses to first degree murder, the trial court
           did not abuse its discretion in declaring a mistrial, implicitly on the ground of
14         legal necessity. In <i>Rojas</i>, the jury had deliberated for five and a half hours when
           the foreperson informed the court of a nine-to-three deadlock. (<u><i>Rojas, supra</i>, 15</u>
15         <u>Cal.3d at p. 546.</u>) In <i>Rojas</i>, as here, the court asked the foreperson if further
           deliberations would be of value, and she responded negatively. The court then
16         directed this same question to all the jurors, and, similar to the facts of this case,
           various jurors shook their heads negatively. (<i>Ibid</i>.) "Under these circumstances it
17         cannot be said that the court abused its discretion in discharging the jury[,] as it
           properly determined that there was no reasonable probability that a verdict could
18         be reached." (<i>Ibid</i>.) "[A]ccordingly, the jury was validly discharged for legal
           necessity." (<i>Id</i>. at p. 547.)
19
    <u>Renteria</u>, 2007 WL 2421774, at *6.
20
    **C.   Pertinent Federal Law and Analysis**
21
           The double jeopardy clause of the Fifth Amendment of the Constitution protects an
22
    accused's "valued right to have his trial completed by a particular tribunal." <u>Arizona v.</u>
23
    <u>Washington</u>, 434 U.S. 497, 503 (1978) (internal quotations omitted). To prevent unfairness to the
24
    accused, the prosecutor is generally entitled to only one opportunity to require the accused to
25
    stand trial. <u>Arizona</u>, 434 U.S. at 504-05. Jeopardy attaches when the jury is empaneled and
26
    sworn. <u>Crist v. Bretz</u>, 437 U.S. 28, 29 (1978); <u>United States v. Williams</u>, 717 F.2d 473, 475 (9th
27

28                                                      8

Cir.1983). It is clear from this record that jeopardy had already attached before a mistrial was declared. If a case is dismissed after jeopardy attaches but before the jury reaches a verdict, a defendant may be tried again for the same crime only in two circumstances: (1) if the defendant consents to the dismissal or (2) if the trial court determines that the dismissal was required by "manifest necessity." <u>U.S. v. Bonas</u>, 344 F.3d 945, 948 (9th Cir. 2003).

### 1.    Implied Consent

Here, Petitioner did not request or expressly consent to the mistrial; thus, this case turns on whether any statements or silences of Petitioner's counsel constituted implied consent. <u>See</u> <u>U.S. v. Smith</u>, 621 F.2d 350, 351-52 (9th Cir. 1980). An implied consent to a mistrial, like an express consent, removes any double jeopardy bar to retrial. <u>Id.</u> at 351. Generally, implied consent exists if, after the declaration of a mistrial, defense counsel has an opportunity to object but fails to do so. <u>See</u>, <u>e.g.</u>, <u>U.S. v. Bates</u>, 917 F.2d 388, 393 (9th Cir. 1990) ("because [defendants] had no opportunity to object, we will not infer that they consented to the mistrial."); <u>see</u> <u>also</u> <u>Weston v. Kernan</u>, 50 F.3d 633, 637 (9th Cir. 1995) ("A defendant's consent to mistrial may be inferred only where the circumstances positively indicate a defendant's willingness to acquiesce in the mistrial order.") (internal quotations omitted).

Petitioner argues that he did not impliedly consent to the mistrial because "nothing in the record indicates a willingness on the part of petitioner to acquiesce in the mistrial order." Pet. Traverse at 4. Indeed, the record reflects that the trial judge issued the mistrial order sua sponte, and did not afford Petitioner any opportunity to object to the order. In the absence of any evidence indicating implied consent on the part of Petitioner, it cannot be said that Petitioner consented to the mistrial order. Thus, the trial court's declaration of a mistrial must have been required by manifest necessity in order to be lawful. <u>See</u> <u>Bonas</u>, 344 F.3d 945 at 948.

### 2.    Manifest Necessity

While only a "high" degree of necessity can justify a mistrial, <u>Arizona</u>, 434 U.S. 497 at 506, a trial court's decision to declare a mistrial when it considers the jury deadlocked is

1  accorded great deference by a reviewing court. <u>Id</u> at 509. Moreover, it is not necessary for the

2  trial court to make an explicit finding of manifest necessity or to articulate on the record all the

3  factors which informed its discretion. <u>Id.</u> at 516-17.

4       Here, the record indicates that after four days of deliberations, the jury was deadlocked

5  with respect to the lesser included offenses of first degree murder.[2] <u>Id.</u> at 7. The foreperson stated

6  that further deliberations were unlikely to result in a unanimous verdict on the charges on which

7  the jury was deadlocked. <u>Id.</u> Based on these facts, it was not objectively unreasonable for the

8  Court of Appeal to affirm the trial court's declaration of a mistrial. <u>See</u> <u>Renteria</u>, 2007 WL

9  2421774, at *6; 28 U.S.C. § 2254(d)(2).

10      In light of the foregoing, Petitioner is not entitled to federal habeas relief on his double

11  jeopardy claim. <u>See</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 119 (2007) (federal court may not award habeas

12  relief under § 2254 unless state court's harmlessness determination was objectively

13  unreasonable); <u>Ponce v. Felker</u>, 606 F.3d 596, 606 (9th Cir. 2010) (same).

14  **II.  THE JURY'S ACQUITTAL OF FIRST DEGREE MURDER**

15      Petitioner's second claim is that because he was effectively acquitted of first degree

16  murder in his first trial, the first degree murder charge in the bench retrial violated the

17  prohibition against double jeopardy. Pet. at 8; U.S. Const. amend. V. He argues that his

18  conviction must be overturned "because there is a reasonable probability petitioner would not

19  have been convicted of second degree murder absent the presence of the greater offense." <u>Id.</u>

20  Petitioner's claim fails because the Court of Appeal reasonably found that a seasoned trial judge

21  would not be prejudiced by the inclusion of the jeopardy barred offense in the bench retrial.

22  **A.  Background and the Court of Appeal Opinion**

23      The Court of Appeal found, and Respondent does not dispute, that Petitioner's retrial for

24  first degree murder violated double jeopardy. <u>Renteria</u>, 2007 WL 2421774, *8. While not

25  _____

26       [2]After four days of deliberations, the jury was deadlocked as follows: six voted for
    second degree murder, three for manslaughter, two for self-defense, and one for either
27  manslaughter or self-defense. <u>Renteria</u>, 2007 WL 2421774, at *5.

28                                              10

1   formally acquitted of first degree murder, retrying Petitioner for first degree murder violated

2   double jeopardy because the trial court committed a procedural error when it gave a confusing,

3   off-the-cuff instruction that caused the jury not to write down its verdict on first degree murder.

4   Id. at *7. By failing to remedy the error by polling the jury, "the court left open the path for the

5   state to put defendant again in jeopardy for first degree murder." Id. at *8.

6          Despite the trial court's violation of double jeopardy guarantees, the Court of Appeal

7   found that any error was moot:

8          Relying on *People v. Ham* (1970) 7 Cal.App.3d 768, 774, overruled on another
           ground in *People v. Compton* (1971) 6 Cal.3d 55, 60, footnote 3, the People urge
9          us to reject [Petitioner]'s claim as moot because the court found him guilty only
           of second degree murder at his retrial.

10
           *Ham* presented circumstances similar to this case. The superior court had
11         determined at the [Petitioner]'s first trial that the jury had been unable to reach a
           verdict on attempted murder and discharged it. The [Petitioner] was retried and
12         acquitted of attempted murder but convicted of two other offenses. Before retrial,
           the [Petitioner] moved to dismiss the attempted murder charge on the grounds of
13         former jeopardy. The superior court denied the motion. The jury, in the second
           trial, found the [Petitioner] not guilty of attempted murder. On appeal, the
14         [Petitioner] argued that the superior court had prematurely discharged the jury at
           his first trial, doing so without legal necessity, and therefore the state placed him
15         twice in jeopardy when it retried him on the attempted murder charge. *Ham*
           rejected the claim on grounds of lack of prejudice, stating, "any consideration of
16         the plea"-and more generally the issue-"of double jeopardy as to this count has
           been rendered moot by virtue of the fact that [Petitioner] was found not guilty as
17         to this count. An appellate court will not review error unless it is prejudicial, i.e.,
           it must be error that substantially affects the rights and obligations of the
18         appellant and therefore results in a miscarriage of justice." (*People v. Ham*,
           *supra*, 7 Cal.3d at p. 774.)
19
           Twenty-six days after *Ham* was filed, the United States Supreme Court decided
20         *Price v. Georgia*, [398 U.S. 323 (1970)], and took a different view regarding
           prejudice. Price was charged with murder and the jury convicted him only of
21         voluntary manslaughter. That conviction was reversed on appeal, and the state
           retried him, again seeking a murder conviction in the face of Price's plea of
22         *autrefois acquit* (i.e., former jeopardy; in this state see §§ 1017, par. 4 [plea of
           once in jeopardy], 1023 [bars to later prosecution]; see also §§ 656, 793, 794).
23         Once again, however, the jury rejected the murder charge and convicted Price
           only of voluntary manslaughter. (*Price v. Georgia, supra*, 398 U.S. at p. 324.)
24
           *Price* held that because the [Petitioner] was effectively acquitted of murder at his
25         first trial, retrying him on that charge violated the double jeopardy clause. (*Price
           v. Georgia, supra*, 398 U.S. at p. 324.) "Although [Price] was not convicted of
26         the greater charge on retrial ... the risk of conviction on the greater charge was
           the same in both cases, and the Double Jeopardy Clause of the Fifth Amendment
27

28                                              11

is written in terms of potential or risk of trial and conviction, not punishment." (*Id.* at p. 329.)

*Price* then rejected the state's suggestion that retrying Price constituted harmless error because he was not convicted of murder on retrial. Along with the harm done by undergoing the unnecessary "ordeal" (*Price v. Georgia*, *supra*, 398 U.S. at p. 331) of an improper retrial, the court stated that "we cannot determine whether or not the murder charge against petitioner induced the jury to find him guilty of the less serious offense of voluntary manslaughter rather than to continue to debate his innocence." (*Ibid.*) In other words, there was the risk that a compromise verdict occurred rather than the outright exoneration that might have been brought about had Price been recharged only with the lesser offense.

Thus, under *Price*, a double jeopardy violation under these circumstances "is not to be readily disposed of as 'moot' or harmless," for "acquittal (even if implied) upon retrial of the greater offense does not by itself render the double jeopardy violation harmless." (*Brazzel v. Washington* (9th Cir.2007) 484 F.3d 1087, 1097 [opinion amended and superceded by 491 F.3d 796].)

Nonetheless, the United States Supreme Court later limited *Price*. The court announced that its "holding in *Price* did not impose an automatic retrial rule whenever a defendant is tried for a jeopardy-barred crime and is convicted of a lesser included offense. Rather, the Court relied on the likelihood that the conviction for manslaughter had been influenced by the trial on the murder charge-that the charge of the greater offense for which the jury was unwilling to convict also made the jury less willing to consider the defendant's innocence on the lesser charge." (*Morris v. Mathews*, *supra*, 475 U.S. at p. 245.)

*Morris* discerned that *Price* had applied a blunt ax to the question of prejudice and announced a defter rule that we believe governs this case. "[W]e hold that when a jeopardy-barred conviction is reduced to a conviction for a lesser included offense which is not jeopardy barred, the burden shifts to the defendant to demonstrate a reasonable probability that he would not have been convicted of the nonjeopardy-barred offense absent the presence of the jeopardy-barred offense. In this situation, we believe that a 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*Morris v. Mathews*, *supra*, 475 U.S. at pp. 246-247.)

To be sure, in *Morris* an appellate court had reduced the defendant's conviction from a jeopardy-barred offense to one not barred by jeopardy. (*Morris v. Mathews*, *supra*, 475 U.S. at p. 243; *see also id.* at p. 244 [parties agreed on which offenses were barred and which were not].) Here, by contrast, the trial court found [Petitioner] not guilty of the jeopardy-barred offense and guilty of an offense that was not jeopardy-barred. The distinction, however, is immaterial with regard to the remedy [Petitioner] should be afforded. "After all, one of the purposes of the Double Jeopardy Clause is to prevent multiple prosecutions and to protect an individual from suffering the embarrassment, anxiety, and expense of another trial for the same offense [citation]. In cases like this, therefore, where it is clear that the jury necessarily found that the [Petitioner]'s conduct satisfies the elements of the lesser included offense, it would be incongruous always to order yet another trial as a means of curing a violation of the Double Jeopardy Clause." (*Id.* at p. 247.) Something similar is true here: it would be incongruous

12

to order a third trial to decide [Petitioner]'s guilt of second degree murder when he was already convicted of it in the second trial. To be sure, if this were a close case, [Petitioner] would undoubtedly be willing to undergo the embarrassment and anxiety of a third trial in hopes of being acquitted of murder, and the rationale expressed in *Morris* would not carry much weight. This, however, was not a close case, notwithstanding the uncertainty of the jurors in the first trial about whether to convict [Petitioner] of murder, manslaughter, or nothing at all.

[Petitioner] has not met his burden of showing a reasonable probability (*Morris v. Mathews*, *supra*, 475 U.S. at p. 247) that trying him again for first degree murder tainted his second degree murder conviction. The case was retried not to a jury, but to the court, and on the transcripts of the prior trial, with only a new round of closing arguments added. A seasoned trial judge is ordinarily dispassionate, and [Petitioner] does not point us to anything in the record that might indicate the trial court here was otherwise. We therefore presume that the court would not have been swayed by the array of charges and tempted to reach a compromise verdict.

Moreover, even if the analysis in *Price v. Georgia*, *supra*, 398 U.S. 323, controls, unlike the courts in *Price*, *supra*, at page 331, and *Brazzel v. Washington*, *supra*, 484 F.3d at page 1097, we are able to determine that the trial court did not impose the murder conviction because it was presented with a first degree murder charge. As stated, a seasoned trial judge is ordinarily dispassionate, and, even under a *Price*-based analysis where [Petitioner] would not bear the burden of making a contrary showing, we are confident on this record that the trial court was not swayed by the array of charges and tempted to reach a compromise verdict.

Accordingly, any error was vitiated (whether we describe it in terms of prejudice or mootness is a technical question we need not address) and [Petitioner] received his remedy with regard to his criminal liability when the court acquitted him of first degree murder on retrial.

Renteria, 2007 WL 2421774, **8-11.

## B.   Pertinent Federal Law and Analysis

The Supreme Court has held that acquittal upon retrial of the greater offense does not by itself render the double jeopardy clause harmless. Price v. Georgia, 398 U.S. 323, 331. In Price, for example, the defendant was tried for murder and the lesser included offenses of murder. Id. at 324. A jury acquitted him of murder but found him guilty of voluntary manslaughter. Id. The state court of appeal reversed because of erroneous jury instructions and ordered a new trial. Id. Even though he had been acquitted of murder, the defendant was again placed on trial for murder under the original indictment. Id. The jury, like the first, found petitioner guilty of voluntary

13

1    manslaughter. Id. Even though he was acquitted of the jeopardy barred offense of murder, the

2    Supreme Court held the error was not harmless. Id. at 331. It reasoned as follows:

3            The Double Jeopardy Clause . . . is cast in terms of the risk or hazard of trial and
             conviction, not of the ultimate legal consequences of the verdict. To be charged
4            and to be subjected to a second trial for first-degree murder is an ordeal not to be
             viewed lightly. Further, and perhaps of more importance, we cannot determine
5            whether or not the murder charge against petitioner induced the jury to find him
             guilty of the less serious offense of voluntary manslaughter rather than to
6            continue to debate his innocence.

7    Id. at 332.

8            The Supreme Court has distinguished Price from cases in which the jury did not acquit

9    the defendant of the greater offense, but found the defendant guilty of the greater offense and the

10   alternative lesser offense by implication. See Morris v. Mathews, 475 U.S. 237, 246 (1986).

11   Under such circumstances, the burden rests on the defendant to establish that being tried twice

12   for the greater offense tainted the conviction of the lesser offense. Id.

13           This case is distinguishable from Morris because Petitioner was acquitted at his second

14   trial of the greater offense and convicted of the lesser alternative charge of second degree

15   murder. Importantly, this case is also distinguishable from Price, because Petitioner's retrial was

16   a bench trial, not a trial by jury. Thus, the primary evil addressed in Price–the risk of jury

17   prejudice–is not present. As the Court of Appeal rightly observed, "a seasoned trial judge is

18   ordinarily dispassionate, and, even under a Price-based analysis where defendant would not bear

19   the burden of making a contrary showing, we are confident on this record that the trial court was

20   not swayed by the array of charges and tempted to reach a compromise verdict." Renteria, 2007

21   WL 2421774, at *10.

22           It simply cannot be said that the Court of Appeal's determination that the double

23   jeopardy error was harmless involved an unreasonable determination of the facts. See 28 U.S.C.

24   § 2254(d); Fry, 551 U.S. at 119 (federal court may not award habeas relief under § 2254 unless

25   state court's harmlessness determination was objectively unreasonable). Any error was

26

27

28                                                    14

1  neutralized by the bench trial, and Petitioner received his remedy when the trial court acquitted

2  him of first degree murder.

3       Accordingly, Petitioner is not entitled to federal habeas relief on his double jeopardy

4  claim arising out of being tried a second time for first degree murder.

5  **III.    WAIVER OF RETRIAL BY JURY**

6       Petitioner's third and final claim is that his waiver of his right to a jury trial was not

7  knowing, intelligent and voluntary because (1) "[i]t was induced by the trial court's erroneous

8  ruling that a retrial for first degree murder was not barred by the double jeopardy prohibition"

9  and (2) it was based upon his belief that a first degree murder charge was properly brought. Pet.

10 at 13. Petitioner's claim fails because the Court of Appeal correctly found that the detailed

11 motion filed by Petitioner in support of waiving his rights rendered the waiver knowing,

12 intelligent and voluntary.

13     **A.    Background**

14     The Court of Appeal summarized the facts giving rise to this claim as follows:

15         [Petitioner] predicates his claim on an argument that, had the state not
16         improperly placed him twice in jeopardy for first degree murder, he would not
           have consented to waive his jury trial rights. He asserts that he waived his rights
17         in exchange for the prosecution's agreement not to introduce the testimony of
           Miguel Vargas, his former co-defendant, whom he described in papers filed with
18         the trial court as the witness the prosecution viewed as its best source of
           evidence regarding first degree murder**.**

19         [[Petitioner] further predicates his claim on an argument that] his decision to
           waive a jury [sic] was based upon his belief that a first degree murder charge was
20         properly brought and therefore his waiver was not knowing, intelligent, and
           voluntary.
21

    Renteria, 2007 WL 2421774, *11 (internal quotations omitted).
22

23     **B.    Court of Appeal's Opinion**

24     The Court of Appeal found that Petitioner's waiver of his right to a trial by jury was

25 knowing, voluntary and intelligent. It made its decision in light the detailed motion filed by

26 Petitioner in support of waiving his jury trial rights. The motion made clear that Petitioner's

27

28                                                       15

waiver was based on the substantial benefits he would receive by proceeding with a bench trial as opposed to a jury trial. As the Court of Appeal explained:

> [D]efense counsel explained that Vargas might be able to implicate [Petitioner] on both first and second degree murder. Counsel explained that Vargas might testify that [Petitioner] sent someone inside Maria's Club to see if Cuevas was there. "[O]n July 24th of 2003 Mr. Vargas gave a second statement. That statement was much more damaging to Mr. Rentería." "[I]t supplies the Prosecution with the argument that looks like it makes it a first degree or at the very least a second degree [murder] ... that [Camilo] Esquível looked into the bar prior to the time Mr. Rentería got to the door of the bar to see if Pelón was there or Pelar, which means the bald-headed one, could possibly be referring to Mr. Cuevas." To be sure, [Petitioner] vigorously maintained that Vargas was an unreliable witness who could be impeached by other testimony. But it was unclear how things might play out before a jury. The detailed motion filed with the court in support of waiving [Petitioner]'s jury trial rights made clear that defense counsel had considered the matter exhaustively and that counsel and [Petitioner] had decided that there was considerable benefit to a nonjury trial. The motion urged the court to alert [Petitioner], in taking his waiver, that the court was likely to find [Petitioner] guilty of "one of the possible charges" on the murder and attempted murder counts and that if the court found him guilty of murder he faced a long prison sentence. [Petitioner]'s waiver of his jury trial rights was knowing, intelligent, and voluntary.

Renteria, 2007 WL 2421774, *11.

## C.  Pertinent Federal Law and Analysis

A criminal defendant's right to a jury trial is a fundamental right guaranteed by the Sixth Amendment. U.S. Const. amend. VI; United States v. Cochran, 770 F.2d 850, 851 (9th Cir.1985). The right to a jury trial may only be waived if the following four conditions are met: (1) the waiver is in writing; (2) the government consents; (3) the court accepts the waiver; and (4) the waiver is made voluntarily, knowingly, and intelligently. Cochran, 770 F.2d at 851; see also Fed.R.Crim.P. 23(a) ("Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government."). With respect to the fourth prong, which is at issue here, the Ninth Circuit has held that the district court was not required to question the defendant about his understanding of the jury waiver where the defendant had signed a written waiver in accordance with Fed.R.Crim.P. 23(a). Cochran, 770 F.2d at 851. Compliance with the requirements of

16

Fed.R.Crim.P. 23(a) creates a presumption that the waiver is voluntary, knowing and intelligent. Id.

Here, Petitioner argues that he waived his rights in exchange for the prosecution's agreement not to introduce the testimony of Miguel Vargas. This argument is unpersuasive. The record shows that Vargas's testimony would also have been relevant, and damaging, on the lesser included offenses. Indeed, the detailed motion filed by Petitioner in support of waiving his rights shows that Petitioner had discussed the matter extensively with his counsel and decided there was considerable benefit to proceed with a bench trial. The motion–a  written waiver–creates the presumption that it was knowingly, voluntarily and intelligently made, and Petitioner's argument fails to overcome this presumption.

Petitioner's second argument, that he would not have consented to the waiver if the trial court had correctly ruled on his jeopardy motion, fails as well. As the Court of Appeal correctly stated, "[Petitioner] agreed to the retrial procedure knowing that there was a substantial question whether the first degree murder charge was constitutional, an issue he could raise in [the Court of Appeal] and the California Supreme Court." Renteria, 2007 WL 2421774, *11. The motion also recognized that the court was likely to find Petitioner guilty of one of the possible charges. Id. Nevertheless, Petitioner chose not to appeal the ruling on his jeopardy motion, and instead chose to proceed with the bench trial.

Based on the foregoing, it was not objectively unreasonable for the Court of Appeal to find that Petitioner's waiver of his jury trial rights was knowing, intelligent, and voluntary. See 28 U.S.C. § 2254(d). Therefore, Petitioner is not entitled to federal habeas relief on his Sixth Amendment claim arising out of his waiver of his right to a jury trial.

## CONCLUSION

After careful consideration of the record and relevant law, the Court is satisfied that the petition for a writ of habeas corpus must be DENIED.

//

1   //

2   //

3   The clerk shall enter judgment in favor of Respondent and close the file.

4   **IT IS SO ORDERED.**

5

6   DATED: January 11, 2011

7   CHARLES R. BREYER
    United States District Judge

8

9

10  G:\CRBALL\2008\5325\Order denying habeas petition.wpd

18